UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | |
|---|---|
| INNOVATIVE WATER CARE, LLC, | ) |
| | ) |
| Plaintiff, | ) 1:22-CV-00070-DCLC-CHS |
| | ) |
| vs. | ) |
| | ) |
| OLIN CORP., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Innovative Water Care, LLC's ("IWC") Motion for a Preliminary Injunction [Doc. 7]. Defendant Olin Corporation ("Olin") has responded [Doc. 12], and IWC has replied [Doc. 15]. The Court conducted a preliminary injunction hearing on April 11, 2022. This matter is now ripe for resolution.

### I. BACKGROUND

IWC is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia [Doc. 1-1, pg. 9]. It is a chemical manufacturer that focuses on water treatment, specifically in drinking water, process water, wastewater, and irrigation [Doc. 7, pg. 4]. Olin is a Virginia corporation with its principal place of business in Clayton, Missouri [Doc. 1-1, pg. 9]. It is a manufacturer and distributer of chemical products, including chlorine and caustic soda, which are integral to IWC's business [Doc. 7, pg. 4]. According to IWC, Olin serves as its primary provider of chlorine and caustic soda [*Id.*]. The parties business relationship goes back over two decades, and they operate a shared physical site in Charleston, Tennessee ("Charleston facility") [*Id.*]. Olin delivers IWC's chlorine and caustic soda orders through a pipe system that connects the parties operating plants at the Charleston facility [*Id.*].

In 2016, Olin and IWC[1] executed a ten-year supply/purchase agreement ("Sales Contract") in which Olin agreed to provide 100% of IWC's requirements of up to 85,000 short tons of chlorine and up to 45,000 dry short tons of caustic soda in any calendar year [Doc. 7-1, pg. 1]. The parties agreed to establish the estimated annual volume of chlorine and caustic soda for the calendar year "each October for the following year upon submission by [IWC] to [Olin]." [*Id.*]. Olin also agreed to maintain "a minimum of 2 days of inventory for [IWC], or a minimum of 360 tons of Chlorine and 275 dry short tons of Caustic Soda each day during the Term of [the] Sales Contract." [*Id.*, pg. 2]. In the event that "[Olin] fail[ed] to deliver product to [IWC] in breach of the terms and conditions of the Sales Contract for fifteen (15) consecutive days," IWC could (1) cover by purchasing substitute product from a third party and charge Olin the difference between the price paid for the substitute product and the Sales Contract price and (2) request that Olin unload the substitute product at the Charleston facility, if IWC was unable to arrange for unloading the substitute product [*Id.*]. Olin agreed that IWC would be "irreparably harmed" in the event of this "Delivery Failure" and agreed "not to raise any objections to the equitable remedy of specific performance." [*Id.*, pgs. 2-3].

Although IWC would provide annual estimates each October, the "terms and conditions" attached to the Sales Agreement provided as follows:

> [IWC] shall give [Olin] thirty days prior notice of the quantity to be shipped in any contract month (the "Monthly Forecast"). The quantity shipped in any contract month may be limited by [Olin] to either (a) the monthly quantity herein specified, or, if no monthly quantity is specified, the pro rata portion of the maximum quantity herein specified, or (b) the monthly amount set forth in [IWC's] annual forecast.

---

[1] IWC's predecessor-in-interest, Arch Chemicals, Inc., negotiated and executed the Sales Contract with Olin at that time [Doc. 7-1, pg. 1].

2

[*Id.*, pg. 4, ¶ 2]. IWC's remedy for breaches of the Sales Contract, other than for a "Delivery Failure," was limited to damages not to exceed three times the purchase price of a particular shipment at issue [*Id.*, pg. 4, ¶ 11]. The parties agreed that the waiver of any breach or failure to enforce any terms or conditions of the Sales Contract did not waive a party's ability to later enforce strict compliance [*Id.*, pg. 5, ¶ 13]. Lastly, the parties agreed that, in the event of a discrepancy between the Sales Contract and its terms and conditions, the Sales Contract controlled [*Id.*, pg. 3].

For the past six years, Olin met all IWC requirements for chlorine and caustic soda without incident [Doc. 7, pg. 6]. Every fall, IWC provided Olin with its monthly forecasts for the following year, and if its actual use exceeded its monthly estimates, Olin met its product needs without any changes in pricing. The same occurred in late 2021. IWC provided Olin with its annual monthly estimates for calendar year 2022. But in December 2021, "the world had changed" and the market price of chlorine and caustic soda dramatically increased. Olin notified IWC that it would be limiting IWC to no more than "7,083 short tons of chlorine and 3,750 dry short tons of caustic soda" per month [Doc. 3, pg. 3]. Olin explained that this was the *pro rata* amount of the maximum quantity per calendar year specified in the Sales Contract [Docs. 3, pg. 3; 12, pg. 3]. Olin informed IWC that it could continue to order product in excess of the monthly *pro rata* amount, but for any excess, it would have to pay the market price for those amounts rather than the Sales Contract price [Doc. 12, pgs. 3-4]. IWC rebuffed Olin's request and continued to order chlorine and caustic soda for December 2021, January 2022, and February 2022 as it had done previously, and Olin filled those orders [Doc. 7, pg. 8]. In February 2022, Olin invoiced IWC with the market price for the amounts of IWC's January and February 2022 orders that exceeded the *pro rata* amount [Doc. 12, pg. 4]. IWC protested the invoice. When IWC refused to pay according to Olin's terms, Olin

3

notified IWC that it would shut off IWC's supply of chlorine and caustic soda after IWC reached those maximum monthly pro rata amounts [*Id.*].

On March 16, 2022, IWC filed a verified complaint and request for a temporary restraining order ("TRO") in the Chancery Court of Bradley County, Tennessee, alleging a claim for breach of contract [Doc. 1-1, pgs. 9, 25-26]. The Chancery Court granted IWC's request for a TRO and enjoined Olin from changing any of the terms and conditions of the Sales Contract, increasing the price it charges IWC for chlorine and caustic soda, limiting the amount of those chemicals supplied to IWC on a monthly basis, refusing or failing to deliver and supply IWC with those products, and shutting off or deferring IWC's supply of those products [*Id.*, pg. 4]. That TRO expired on March 30, 2022.

On March 21, 2022, Olin removed the case to this Court [Doc. 1]. IWC has since moved for a preliminary injunction with the same parameters as the TRO it received in Chancery Court [Doc. 7]. Olin has responded [Doc. 12], and IWC has replied [Doc. 15]. The Court conducted a hearing on IWC's motion on April 11, 2022, and both parties presented testimony from witnesses.

## II.     LEGAL STANDARD

A preliminary injunction is an extraordinary equitable remedy. To obtain one, a moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent an injunction; (3) the balance of the equities tips in its favor; and (4) the injunction is in the public's interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* Fed. R. Civ. P. 65(a). The proof necessary for the plaintiff to obtain a preliminary injunction is more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). Although the Court balances these factors, the movant must show at least some likelihood of

success on the merits and that it likely will suffer irreparable harm absent the injunction. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019); *S. Glazer's Distribs. of Ohio, L.L.C. v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

III. ANALYSIS

    A. Likelihood of success on the merits

Although no one factor is controlling, a finding that there is no likelihood of success on the merits usually is fatal. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). Under Tennessee law, "[i]n a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). "If the language of the contract is clear and unambiguous," the Court will determine the parties' intent from the four corners of the contract by interpreting the contract "according to its plain terms as written" and "giv[ing] reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." *Maggart v. Almany Realtors Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). "However, on occasion, a contractual provision may be susceptible to more than one reasonable interpretation, rendering the terms of the contract ambiguous." *Id.* When the Court determines that "the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the court[ ] must resort to other rules of construction." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The Court will construe the ambiguity against the drafter of the contract. *White v.*

5

*Empire Exp., Inc.*, 395 S.W.3d 696, 714 (Tenn. Ct. App. 2012). If the pertinent rules of construction do not resolve the ambiguity, then the legal meaning of the contract becomes a question of fact. *Id.*

IWC argues that Olin has no legitimate basis for limiting its supply of chlorine and caustic soda to the monthly pro rata amount [Doc. 7, pg. 20]. Olin, meanwhile, cites to the "Quantity" section in the terms and conditions of the agreement, which, in pertinent part, provides "[t]he quantity shipped in any contract month may be limited by [Olin] to . . . the monthly quantity herein specified, or if no monthly quantity is specified, the pro rata portion of the maximum quantity herein specified . . . ." [Doc. 7-1, pg. 4]. Olin argues that because IWC has not made any "Monthly Forecast" under this section, but only provided a monthly amount set forth in its annual forecast, it can limit the product shipped each month to the *pro rata* monthly amounts [Docs. 7-1, pg. 4, ¶ 2(a); 12, pg. 9]. IWC maintains that Olin's position of setting a monthly maximum and charging market prices for any excess instead of the price agreed to in the Sales Agreement is inconsistent with express terms of their agreement [Doc. 7, pg. 22]. The Sales Contract does not set monthly maximum amounts, but only annual maximum amounts. And, to the extent that the terms and conditions are different than the Sales Contract, the Sales Contract controls. It further argues that the term "pro rata" is ambiguous, which allows the Court to consider the parties prior course of dealings to establish their intent [Doc. 7, pg. 22].

The Court struggles to construe the Sales Contract and the terms and conditions in the manner that Olin suggests. Although both parties noted during the hearing that, technically, there is no "monthly quantity specified" in the Sales Contract, the Sales Contract calls for an "estimated annual volume" to be established each October for the following year [Doc. 7-1, pgs. 1, 4, ¶ 2]. Olin does not dispute that IWC provides that annual forecast every year and that the annual forecast

6

includes monthly forecasts of IWC's need for chlorine and caustic soda. Olin also does not dispute that it received IWC's 2022 annual forecast, which broke down its needs on a monthly basis. Interpreting the Sales Contract as a whole, that monthly breakdown appears to be what the Sales Contract contemplates in using the phrase "monthly quantity herein specified." [*Id.*, ¶ 2(a)]. Indeed, IWC's annual forecast, with a monthly breakdown, has the same effect as IWC simply submitting its volume request 30 days before the following month, which the quantity provision explicitly allows IWC to do. [*Id.*]. The only difference between IWC submitting its request 30 days before the following month and IWC relying on the monthly volumes listed in its annual forecast is that the annual forecast is submitted with significantly more than 30-days-notice to Olin. Because IWC likely complied with the quantity provision of the terms and conditions, Olin cannot use Section 2 in the terms and conditions to limit IWC's supply to the *pro rata* monthly amount. Thus, at this stage of litigation, IWC has shown a substantial likelihood of success on the merits.

### B. Likelihood of irreparable harm absent an injunction

The existence of an irreparable injury is necessary for a court to issue a preliminary injunction. *D.T.*, 942 F.3d at 327. An injury is irreparable if the harm is difficult to calculate. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Such harm must be likely, not just possible. *Winter*, 555 U.S. at 22.

IWC first argues that, in the Sales Contract, the parties agreed it would suffer irreparable harm if Olin disrupted its supply of chlorine and caustic soda [Doc. 7, pg. 23]. But that provision requires a breach of the contract "for fifteen (15) consecutive days." [Doc. 7-1, pg. 2]. Both parties agree that has not occurred. During the hearing, Jeremy Blanks, IWC's Chief Operating Officer, likened this to a *force majeure* event. Moreover, the parties' agreement that irreparable harm would occur in such a specific situation cannot now be construed as a generalized agreement

7

that IWC will be irreparably harmed for all disruptions, even those less than 15 consecutive days. In fact, the opposite is the case. The parties agreed that for breaches other than a Delivery Failure IWC's "exclusive remedy . . . under this contract . . . shall be for damages which shall in no event exceed three (3) times the purchase price as is applicable to that portion of the particular shipment with respect to which damages are claimed." [*Id.*, pg. 4, ¶ 11]. IWC's injuries, therefore, can be quantified and assigned a monetary value that IWC can seek to recover at a later stage in this litigation. To be sure, the parties offered exhibits of invoices that included Olin's allegedly inappropriate price increases. Those invoices, presumably, would form the basis for any damages calculations that IWC must make.

Nevertheless, IWC asserts that it still faces irreparable harm because a potential shutdown for a handful of days at the end of the month would lead to a loss of employees, training opportunities for those employees, customers, and customer goodwill, which are all vital to its operation [Doc. 7, pg. 23]. During the hearing, Cindy Storelli, a current IWC employee and former plant manager for the Charleston facility, testified that shutting down that facility for a couple of days at the end of the month would cause irreparable harm by damaging IWC's equipment because the equipment is designed to run continuously rather than in a "start-stop" manner. Renee Whigham, an Olin employee specializing in the manufacture of chlor-alkali products, conceded that IWC's equipment could be damaged by shutting down abruptly. IWC argues that such losses cannot be calculated or compensated with monetary relief [*Id.*].

IWC is correct that the loss of goodwill and competitive advantage may be sufficient to constitute an irreparable injury. *See Basicomputer Corp.*, 973 F.2d at 511; *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017). And IWC expresses valid concerns regarding the impact of a potential shutdown. Those concerns, however, are not new and do not

8

constitute an irreparable harm. The record does not support IWC's claims that it will suffer the loss of goodwill and reputational harm. Both Mr. Banks and Mrs. Storelli made general claims that IWC faced harm to its reputation and goodwill with customers, but IWC presented no other evidence to show the likelihood of such an injury. IWC did not present evidence as to how much of its market share of water treatment products it stood to lose, how many sales it would not be able to fulfill, or which potential significant customer relationships would be impacted. IWC made similar claims regarding the loss of experienced employees but also failed to support those claims. The Court fails to see how potentially shutting down the Charleston facility for a few days at the end of the month would cause IWC to fire employees or cause those employees to lose valuable job expertise, especially when the facility would be operating at the start of the following month.

During the hearing, both parties explained the history of their relationship and noted that, while the current Sales Contract at issue was executed in 2016, their business relationship goes as far back as 1999. Further, Mrs. Storelli testified that the Charleston facility was built in the 1960s. These facts show that all the concerns IWC now raises regarding its equipment and employees were contemplated when the parties executed the Sales Contract in 2016, in which IWC specifically bargained away its ability to seek a remedy other than damages. [Doc. 7-1, pg. 4, ¶ 11]. Indeed, IWC anticipated a potential supply disruption by including an option for it to seek cover in that event. [*See Id.*, pgs. 2, 4, ¶ 2]. IWC asserts that cover is not possible because Olin has discretion to approve the quality of any substitute product and load the substitute product into its piping system. But Olin has given no indication that it would reject an appropriate substitute product or refuse to load such product into its piping system. The concern that it *might* not, without more, is speculative and cannot establish an irreparable injury. *See Winter*, 555 U.S. at 22.

9

IWC requests an injunction without having first attempted to use the methods built into the Sales Contract to address Olin's alleged breach. The fact that IWC likely would have to pay a higher price for substitute product is a standard injury that can be remedied by monetary damages, as set out in the Sales Contract itself. Should IWC seek to cover and Olin refuse to allow it access to its piping system, then IWC can return to the Court and request an injunction to enforce the terms of the Sales Contract.

Lastly, IWC emphasized the importance of maintaining the *status quo* at the hearing. It argued that that the *status quo* was of paramount importance for allowing it time to adjust to Olin's new demands and calculate its damages. But the Sixth Circuit has held that "there is no particular magic in the phrase 'status quo.'" *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (internal citation omitted). The Sixth Circuit has explained that the focus of a preliminary injunction must be on the prevention of injury, "not merely on preservation of the status quo[.]" *Id.* Therefore, IWC's emphasis on the *status quo* is not a sufficient basis to grant a preliminary injunction.

Accordingly, because IWC cannot show irreparable harm, it has failed to establish its need for a preliminary injunction. The Court need not address the remaining elements of a preliminary injunction because it cannot issue an injunction without a showing of irreparable harm, regardless of the weight of the remaining factors. *D.T.*, 942 F.3d at 327.

## IV. CONCLUSION

Based on the foregoing, IWC's Motion for Preliminary Injunction [Doc. 7] is **DENIED**. Olin's Motion to Dissolve Temporary Restraining Order [Doc. 3] is **DENIED AS MOOT.**

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

10

Case 1:22-cv-00070-DCLC-CHS   Document 18   Filed 04/15/22   Page 10 of 10   PageID #: 195