UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| INNOVATIVE WATER CARE, LLC, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 1:22-CV-00070-DCLC-CHS |
| | ) | |
| vs. | ) | |
| | ) | |
| OLIN CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Olin Corporation's ("Olin") Motion to Dismiss [Doc. 11]. Plaintiff Innovative Water Care, LLC ("IWC") responded [Doc. 27], and Olin replied [Doc. 29]. This matter is now ripe for resolution. For the reasons that follow, Defendant's Motion to Dismiss [Doc. 11] is **DENIED**.

**I. BACKGROUND**

The Court and parties are familiar with the facts giving rise to the present dispute, and the Court previously outlined the relevant facts in its April 15 and 28, 2022, orders [Docs. 18, 24]. Thus, the Court will give an abbreviated description of the facts.

The parties' business relationship goes back over two decades, and they operate a shared physical site in Charleston, Tennessee ("Charleston facility") [Doc. 1-1, pg. 11, ¶¶ 11-12]. In 2016, Olin and IWC executed a ten-year supply/purchase agreement ("Sales Contract") in which Olin agreed to provide 100% of IWC's requirements of up to 85,000 short tons of chlorine and up to 45,000 dry short tons of caustic soda in any calendar year [*Id.*, pg. 32]. The parties agreed to establish the estimated annual volume of chlorine and caustic soda for the calendar year "each October for the following year upon submission by [IWC] to [Olin]." [*Id.*]. The Sales Contract

included a Supply Guarantee provision, wherein Olin agreed to maintain "a minimum of 2 days of inventory for [IWC], or a minimum of 360 tons of Chlorine and 275 dry short tons of Caustic Soda each day during the Term of [the] Sales Contract." [*Id.*, pg. 33]. In the event that "[Olin] fail[ed] to deliver product to [IWC] in breach of the terms and conditions of the Sales Contract for fifteen (15) consecutive days," IWC could (1) cover by purchasing substitute product from a third party and charge Olin the difference between the price paid for the substitute product and the Sales Contract price and (2) request that Olin unload the substitute product at the Charleston facility, if IWC were unable to arrange for unloading the substitute product [*Id.*]. The Sales Contract termed such a breach by Olin as a "Delivery Failure." [*Id.*].

Although IWC would provide annual estimates each October, the "terms and conditions" attached to the Sales Contract provided as follows:

> [IWC] shall give [Olin] thirty days prior notice of the quantity to be shipped in any contract month (the "Monthly Forecast"). The quantity shipped in any contract month may be limited by [Olin] to either (a) the monthly quantity herein specified, or, if no monthly quantity is specified, the pro rata portion of the maximum quantity herein specified, or (b) the monthly amount set forth in [IWC's] annual forecast.

[*Id.*, pg. 35, ¶ 2]. IWC's remedy for breaches of the Sales Contract, other than for a "Delivery Failure," was limited to damages not to exceed three times the purchase price of a particular shipment at issue [*Id.*, ¶ 11]. Lastly, the parties agreed that, in the event of a discrepancy between the Sales Contract and its terms and conditions, the Sales Contract controlled [*Id.*, pg. 34].

In December 2021, Olin notified IWC that it would be limiting IWC to no more than 7,083 short tons of chlorine and 3,750 dry short tons of caustic soda per month [*Id.*, pgs. 12-14, ¶¶ 21-24]. Olin explained that this was the *pro rata* amount of the maximum quantity per calendar year specified in the Sales Contract [*Id.*, pgs. 12-14, ¶¶ 21-24]. Olin informed IWC that it could continue to order product in excess of the monthly *pro rata* amount, but for any excess, it would have to pay the market price for those amounts rather than the Sales Contract price [*Id.*, pgs. 15-16,

2

¶¶ 24, 28, 31]. IWC rebuffed Olin's request and continued to order chlorine and caustic soda for December 2021, January 2022, and February 2022 as it had done previously, and Olin filled those orders [*Id.*, pgs. 14-15, ¶¶ 23-24]. In February 2022, Olin invoiced IWC with the market price for the amounts of IWC's January and February 2022 orders that exceeded the *pro rata* amount [*Id.*, pgs. 14-15, ¶ 24; *see also id.*, pg. 43]. IWC protested the invoice. When IWC refused to pay according to Olin's terms, Olin notified IWC that it would shut off IWC's supply of chlorine and caustic soda after IWC reached those maximum monthly *pro rata* amounts [*Id.*, pg. 16, ¶ 28; *see also id.*, pg. 45].

IWC filed suit against Olin in the Chancery Court of Bradley County, Tennessee, alleging a claim for breach of contract and requesting injunctive relief [*See generally id.*]. IWC specifically asserted that Olin failed to perform its obligations under the Sales Contract by limiting IWC's supply of product and charging it higher prices for the alleged excess amount of product it required [*Id.*, ¶¶ 57-62]. Olin then removed the case to this Court [Doc. 1], and both parties requested various forms of injunctive relief, which the Court has since resolved [Docs. 18, 24]. Olin now moves to dismiss IWC's Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim [Docs. 1, 11]. IWC responds in opposition [Doc. 27], and Olin replies [Doc. 29].

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires the complaint to contain a "short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Fed. R. Civ. P. 12(b)(6) eliminates a pleading or portion thereof that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) requires the Court to construe the allegations in the complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true. *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990). The Court may not grant a motion

3

to dismiss based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). The Court liberally construes the complaint in favor of the opposing party. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

To survive dismissal, the plaintiff must allege facts that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. The court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), and dismissal is appropriate "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). In addition to the allegations contained in the complaint, a court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" in ruling on a 12(b)(6) motion to dismiss. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (citation omitted). The Court also may take "judicial notice of another court's opinion not for the truth of the facts recited therein, but for the existence of the opinion." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008).

### III. DISCUSSION

Under Tennessee law, "[i]n a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). The interpretation of a written agreement is a question of law. *See Ingram v. Cendant Mobility Financial Corp.*, 215 S.W.3d 367, 374 (Tenn. 2006). But the determination of whether a contract

4

was breached is a question of fact. *Archambeault v. Wyndham Vacation Ownership, Inc.*, No. 3:20-CV-01044, 2021 WL 6496827, at *8 n.20 (M.D. Tenn. July 14, 2021) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). "If the language of the contract is clear and unambiguous," the Court will determine the parties' intent from the four corners of the contract by interpreting the contract "according to its plain terms as written" and "giv[ing] reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." *Maggart v. Almany Realtors Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008).

"However, on occasion, a contractual provision may be susceptible to more than one reasonable interpretation, rendering the terms of the contract ambiguous." *Id.* When the Court determines that "the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the court[ ] must resort to other rules of construction." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). "[I]n reviewing a contract for ambiguities, the court considers the contract as a whole." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894, 897–98 (6th Cir. 2004) (citing *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998)). The Court will construe the ambiguity against the drafter of the contract. *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 714 (Tenn. Ct. App. 2012). If the pertinent rules of construction do not resolve the ambiguity, then the legal meaning of the contract becomes a question of fact. *Id.*

Olin argues that IWC cannot state a claim for breach of contract [Doc. 11, pg. 7]. It contends that IWC's claim fails because IWC has not alleged a deficiency in Olin's performance

5

that amounts to a breach of the Sales Contract [*Id.*, pg. 8]. According to Olin, the Sales Contract allows it to limit IWC's monthly quantity of chlorine to 7,083 short tons and caustic soda to 3,750 dry short tons of caustic soda [*Id.*, pgs. 8-9]. It argues that the term "pro rata" in the contract is unambiguous. [*Id.*, pgs. 10-11]. Additionally, Olin notes the non-waiver provision in the Sales Contract, which states that the parties' prior course of performance cannot modify the Sales Contract [*Id.*, pg. 11]. IWC responds that the Court already has rejected Olin's arguments in its previous orders [Doc. 27, pg. 4]. IWC contends that whether Olin breached the Sales Contract is a question of fact not suited for resolution in a motion to dismiss [*Id.*, pgs. 4-5]. It also contends that Olin does not argue that it has failed to allege the elements of a breach-of-contract claim [*Id.*, pg. 5]. IWC asserts that it has met the pleading requirements for its breach of contract claim [*Id.*, pg. 6].

Olin replies that there is only one reasonable interpretation of the Sales Contract [Doc. 29, pg. 1]. Olin notes that there is no "monthly quantity herein specified" in the Sales Contract [*Id.*, pg. 2]. It states that the "Monthly Forecast" described in ¶ 2 of the "terms and conditions" is for short-term planning and "could be different from or the same as the monthly estimate in the annual forecast." [*Id.*, pg. 3]. Olin contends IWC's reading of the Sales Contract would nullify any distinction between ¶ 2(a) and ¶ 2(b) in the "terms and conditions." [*Id.*]. It states that the phrase "herein specified" must mean an amount specified within the four corners of the Sales Contract [*Id.*, pgs. 3-4]. Olin further argues that the phrase "monthly quantity herein specified" cannot mean the "Monthly Forecast" or the monthly amounts in IWC's annual October estimate because ¶ 2(b) would become meaningless and yield absurd results otherwise [*Id.*, pgs. 6, 9-10]. It next argues that dismissal under Rule 12(b)(6) is appropriate because the interpretation of the Sales Contract is a question of law [*Id.*, pgs. 11-12].

6

Olin hinges its argument on its interpretation of the quantity provision in the "terms and conditions" of the Sales Contract, particularly ¶ 2(a) which states that Olin may limit IWC's supply to the monthly *pro rata* amount only "if no monthly quantity is specified" in the Sales Contract. [Docs. 1-1, pg. 35, ¶ 2; 29, pgs. 1-10]. The Sales Contract calls for an "estimated annual volume" to be established each October for the following year [Docs. 1-1, pg. 32]. Olin does not dispute that IWC provides that annual forecast every year and that the annual forecast includes a monthly estimate of IWC's requested amounts for chlorine and caustic soda. Olin also does not dispute that it accepted IWC's 2022 annual forecast, which included its usual monthly estimates. Interpreting the Sales Contract as a whole, that monthly amount in IWC's annual forecast appears to be what the Sales Contract contemplates in using the phrase "monthly quantity herein specified." [*See id.*, pg. 35, ¶ 2]. IWC's annual forecast has the same effect as IWC submitting its volume request 30 days before the following month, which would constitute a "Monthly Forecast" under the terms of the Sales Contract. [*See id.*]. The only difference between IWC submitting a "Monthly Forecast" and IWC relying on the monthly volumes listed in its annual forecast is that the annual forecast is submitted with significantly more than 30-days-notice to Olin.

Olin argues that interpreting the monthly amounts in IWC's October annual forecast to be the same as the "Monthly Forecast" would render ¶ 2(a) and (b) meaningless. [Doc. 29, pgs. 6, 9-10]. Olin, however, suggests such a reading earlier in its reply, stating that the "Monthly Forecast" is for "shorter-term planning" and "could be different from *or the same as the monthly estimate in the annual forecast*" IWC provides in October. [*Id.*, pg. 3] (emphasis added). Olin also argues it is free to disregard the "Monthly Forecast." [*Id.*, pgs. 8-10]. That argument conflicts with the "Monthly Forecast" requirement that IWC "shall" give Olin 30-days-notice of the amount to be shipped in any contract month [Doc. 1-1, pg. 35, ¶ 2]. Olin's argument here would mean that IWC must submit a "Monthly Forecast" that Olin then can ignore at its discretion, even though

7

Olin admits that the "Monthly Forecast" is for "shorter-term planning." [Docs. 1-1, pg. ¶ 2; 29, pg. 3]. Thus, if the Court credits Olin's arguments, then the "Monthly Forecast" provision would be rendered meaningless because Olin is under no obligation to honor IWC's "Monthly Forecast." And, if the Court interprets the monthly estimates in IWC's annual forecast to satisfy the "Monthly Forecast" requirement, then ¶ 2 (a) and (b) would be meaningless, according to Olin. Both interpretations, at this stage of litigation, render "portions of the [Sales Contract] neutralized or without effect." *Maggart*, 259 S.W.3d at 704.

Olin next asserts that the definition of "monthly quantity herein specified" must mean a quantifiable amount of product within the four corners of the Sales Contract. [Doc. 29, pgs. 3-4]. But under that definition of the "monthly quantity herein specified," any "Monthly Forecast" that IWC submitted would not be set out within the four corners of the Sales Contract, rendering the requirement that IWC "shall" give Olin 30-days-notice superfluous. Further, the "Monthly Forecast" requirement and the "monthly quantity herein specified" phrase are found in ¶ 2 of the "terms and conditions," and the structure of ¶ 2 indicates that the provisions are related and must be read together. Paragraph 2 plausibly can be read to mean that the "monthly quantity herein specified" refers to the "Monthly Forecast," which arguably IWC provided when it submitted its October annual forecast with projected monthly amounts. These two differing interpretations show that the Sales Contract is susceptible to more than one reasonable interpretation, making the Sales Contract ambiguous. *Id.*

Because these dueling interpretations create an ambiguity, and given the standard of review at this stage in the litigation, the Court concludes IWC has stated a cause of action. The Court must construe the ambiguity against Olin as the drafter of the Sales Contract. *Planters Gin Co.*, 78 S.W.3d at 890; *White*, 395 S.W.3d at 714. Further, IWC alleges it has satisfied its obligations under ¶ 2 because it submitted an annual forecast every October that included monthly estimates

8

for the following year, and Olin did not object to those monthly amounts until December 2021. That prior course of dealing informs the Court's understanding of the parties' intent for ¶ 2, which was to provide Olin with enough notice about IWC's needs within the Sales Contract's annual maximum amount for chlorine and caustic soda. Because IWC appears to have complied with ¶ 2 of the "terms and conditions," it has stated a claim—at this stage of litigation—that Olin breached the Sales Contract by limiting IWC's supply of product to the *pro rata* amount.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss [Doc. 11] is **DENIED**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

9

Case 1:22-cv-00070-DCLC-CHS   Document 31   Filed 06/02/22   Page 9 of 9   PageID #: 501